## DENNIS et al. v. TEXAS EMPLOYERS' INS. ASS'N.

### No. 5199.

Court of Civil Appeals of Texas.
Texarkana.

March 23, 1938.

Rehearing Denied April 14, 1938.

C. J. Shaeffer, Geo. W. McHam, and Roy W. McDonald, all of Dallas, for appellants.

Ramey, Calhoun & Marsh and Joe W. Sheehy, all of Tyler, for appellee.

WILLIAMS, Justice.

In this action under the Texas Workmen's Compensation Act, Vernon's Ann.Civ.St. art. 8306 et seq., appellee, Texas Employers' Insurance Ass'n, plaintiff below, instituted this suit to set aside an award of the Industrial Accident Board in favor of appellants, Mrs. Laura E. Dennis, Nelson, Jerry Ruth, James Leroy, Thelma Jean, and Mary Ella Dennis, surviving wife and minor children of Tim R. Dennis, who was instantly killed while working for R. C. Sweeney, receiver for the Cap Rock Oil Company, the insurance being carried by plaintiff.

On the issues submitted, the jury found Dennis to be an employee of Sweeney; that he was not engaged in working for Sweeney as an independent contractor; that he was killed while working in the course of his employment. These findings, together with the agreed facts stipulated in the trial, are sufficient to support a judgment for compensation in favor of the widow and children, provided the deceased was an employee and not an independent contractor at the time. Motions were made by the respective parties to enter judgment, and the trial court granted that of plaintiff to enter judgment in its favor non obstante veredicto, reciting in the judgment so entered: "that from the evidence herein, the deceased, Tim R. Dennis, was, at the time he sustained fatal injury, working as an independent contractor as a matter of law."

R. C. Sweeney as such receiver was in the custody and control of this well at the time Dennis was killed. The well had sanded up with the tubing stuck in the ground. An attempt to pull the tubing by one Bob Price, theretofore employed by Sweeney had failed prior to the time Sweeney and Dennis entered into negotiations for the latter to furnish his equipment and pull the tubing or liner. The deceased and one Leak, calling their business the Industrial Swabbing Company, owned what might be called a swabbing machine, consisting of a swab, Wilson winch, and cable, mounted on a truck. The deceased moved from place to place and furnished with this truck his own motor power. He had worked at this type of work on some eighty wells in the East Texas oil field. Wells which had standard equipment were equipped with cables, winches, and parts similar to those which Dennis had, and, when so equipped,

roustabouts of experience in the oil fields performed the services which Dennis undertook on this occasion. He had engaged in the same task that an experienced roustabout usually performed on a well which had standard equipment. This well did not have standard equipment.

Dennis refused the offer from Sweeney to take the job on a contract price of $150, stating that he never took a job by the contract, that it might require five hours, and it might take three weeks. They finally agreed that Dennis was to be paid $50 a day on an eight-hour day basis, Dennis to furnish his outfit and one helper, and Sweeney to furnish two helpers. Sweeney testified that he told Dennis he did not want to pay over $150, and that the maximum he could spend in effort to remove the tubing was $250; that nothing was said about the pay if it should take more than five days, or if Dennis did not get the tubing out; that Dennis would supervise the work and that was why he (Sweeney) was hiring him, for he knew nothing about such work. As to the contract, the witness Rux testified: "Sweeney said, 'If we can't contract the work it will be satisfactory to work it by the day,' and Mr. Dennis said, 'All right, we will be there next day,' and Sweeney said, 'I am going to tell you the tubing is stuck and I don't know whether or not you will be able to pull it out.' And Dennis said, 'Well, I can try; I never have failed yet.'"

Another witness testified that Dennis agreed to work on the well and do what was necessary to make it produce, for the wages of $50 per day.

During the day and prior to the accident, which occurred about 3:30 p. m., various attempts were made to dislodge the tubing. The helper of Dennis and the two roustabouts furnished by Sweeney handled the details of preparing the cable for each pull and worked the tubing forwards and backwards after a pull. After each pull Sweeney and Dennis and the three helpers would return to the floor of the derrick to take measurement to determine whether any gain had been made. During the progress of the work Sweeney instructed the roustabouts to remove some ropes from the derrick floor; ordered two of the men to melt some babbit off some cables; and instructed Dennis' helper to put a new bridle end on a barrel which pertained to the well. As one witness described the work, "Sweeney was in charge of the work around the derrick, but Dennis was out on the truck telling us what to do. Mr. Sweeney wasn't giving orders to Dennis—they just talked like two men would talk about a job, about one thing and another about the work, and how it was going to be done." There is other testimony to the effect that Sweeney did not give any instructions to the helpers or to any one about the details of the work. The evidence is to the effect that Sweeney was not experienced in this line of work and did not know much about it.

One of the witnesses describes what was said and done just prior to the accident in this way: "We were pulling on the tubing and Dennis had been working on the truck and came up on the floor of the derrick and was talking about the tubing being tight. Sweeney said that Bob Price had pulled in the crown block before, and said, 'Dennis, I don't believe you are going to be able to pull that tubing, just let her back down and put the rods in and forget about it.'"

Another witness testified that Sweeney told Dennis to just make one more pull at it and, if they didn't make any gain, they would put the slips on and fasten it right there and hold it and put the barrel and rods back in; that Dennis said, "This is the first time I ever saw one I couldn't pull out," and that Dennis went back to the truck to try it one more time; "and when Dennis pulled again it pulled the derrick over, killing him." Sweeney testified that Dennis remarked just before the accident that he didn't believe he could pull it out, that Dennis had said he had lifted it about four feet. And he, Sweeney, said, "Can you hold it up that high, maybe it will pump, maybe it is out of the sand." And, when Dennis explained why it was not advisable, he replied, "All right, let it down"; and he thought Dennis was through before the last pull was made. A witness testified that after a whistle nearby had blown for the noon hour one of the workmen asked, "When are we going to eat?" and Sweeney remarked, "Close her down, and let's go and eat."

In Shannon v. Western Indemnity Co., Tex.Com.App., 257 S.W. 522, in an opinion adopted by the Supreme Court, the test to determine the relationship in cases of this type has been stated as follows (page 524): "* * * it will be seen that the outstanding quality of any contract, as touching the question of the independence of same, and which is ultimately the one most decisive of the question, is the one of the right of control of the person employed by the

employer with respect to the details of the work. All other elements bear some relation to that one, and directly or indirectly indicate the presence or the absence of the right of control. For this reason it has often been said that the supreme test of the relation is the right to control." See, also, 14 R.C.L. pp. 67, 68; 31 Cor.Jur. p. 473.

From the oral agreement reached it is observed that the deceased thought he could successfully pull the tubing out of the well with his equipment, but he did not make a contract that he would be successful. Further, nothing was said by these contracting parties that the deceased would direct the details of the work, and nothing was said that Sweeney reserved the right to control the details of the task. So, to a large extent, we are to look to those numerous evidential elements which go to determine the quality of a contract as affecting the question of whether one is an independent contractor or not. It is seldom, if ever, that any one of these elements is decisive of the question. We are to look, not to one factor alone, but to all these elements as a whole to determine the relationship. Various evidential elements are enumerated and discussed in Shannon v. Indemnity Co., supra, and we feel it unnecessary to prolong this opinion by again enumerating them here.

It is evident that the services deceased agreed to perform were not that of a common laborer. Fifty dollars for an eight-hour day for his services, this outfit, and one helper, indicate that he was contracting to render services that would be expected of a man of experience or of one skilled in the work. This service to be performed, with the rate of pay, is not conclusive that the agreement was that of an independent contractor, but it is of probative force to that effect. The deceased was to furnish his own motor power, his own appliances and machinery in doing this work. He was equipped to do this type of work. He had followed this distinct type of employment in the oil fields. He was free to work when and where he pleased. He kept a helper as his employee. These factors alone are not conclusive that he was an independent contractor, but certainly they are of probative force to that effect. With these observations just made we now come to the ultimate or supreme test as announced in the Shannon Case, supra. Did Sweeney reserve the right to manage the details of the undertaking? It can fairly be said that

Sweeney had never operated an oil well before, and was inexperienced in such work. What knowledge he might have had was little, and was only what he may have learned after his appointment as such receiver. This record discloses that the two men employed by Sweeney on the date of this accident did not operate the machinery and did not give instructions to any one about the details of the work. This record discloses, also, that the deceased directed all the details of the operations in effort to dislodge the tubing. Tanner v. Drake, Tex. Civ.App., 47 S.W.2d 452, approved by the Supreme Court in 124 Tex. 395, 78 S.W.2d 163, involved facts in many respects analogous to the present case. In that case the appellee furnished the tools customarily furnished by casing crew contractors. Under the arrangements the owner furnishes the driller and tool dresser, as well as its drilling machinery and the power for hoisting the pipe. The driller ran the engine and machinery. The whole operation of pulling and running the casing was left entirely to appellee's management and supervision. There the court said (page 453): "In this case the work was being done, not under the general direction of the driller, nor were appellee and his men working under the driller's orders, but appellee himself was in charge of the operations, representing the will of the employer only as to the result of his work."

Sweeney was present, but his attention was directed to the results desired. If Sweeney instructed the deceased to try one more time, it was directed to the results and not to the details how it should be done. In the case of Security Union Ins. Co. v. McLeod, 36 S.W.2d 449, 451, Judge Ryan, speaking for the Commission of Appeals, states the rule as follows: "The relation of master and servant exists, where the master retains or exercises the power of control in directing, not merely the end sought to be accomplished, but as well the means and details of its accomplishment; not only what shall be done, but how it shall be done. * * * The mere right of a person who has let out a contract, to supervise the work in such a way as to see that it is performed according to contract, does not make the employees of the contractor his employees."

In several recent cases wherein the evidential elements point closer to the relationship of master and servant than in the present case, the Commission of Appeals, all approved by the Supreme Court, has

determined that the status of independent contractor existed as a matter of law. Cocke & Braden v. Ayer, Tex.Com.App., 106 S.W.2d 1043; Smith Bros. v. O'Bryan, 127 Tex. 439, 94 S.W.2d 145; Ochoa v. Winerich Motor Sales Co., 127 Tex. 542, 94 S.W.2d 416; Southern Surety Co. of New York v. Scheel, 125 Tex. 1, 78 S.W.2d 173; Tanner v. Drake, supra; Security Union Ins. Co. v. McLeod, supra; Shannon v. Western Indemnity Co., supra. From an analysis of the foregoing cases, and the facts of this case applied to those opinions, we conclude as a matter of law that the relationship of master and servant did not exist.

Therefore the action of the trial court in instructing a verdict for the appellee is affirmed.